## ACACIA MUT. LIFE INS. CO. v. BATHURST et al.

### No. E–5678.

District Court, D. New Jersey.

Aug. 14, 1939.

McCarter & English, of Newark, N. J., for plaintiff.

Pitney, Hardin & Skinner, of Newark, N. J. (by Worrall F. Mountain, Jr., of Newark, N. J.), for Marjorie E. Bathurst.

Fowler, Bauer & Kenney, of Boston, Mass., for Therese M. Moreno.

FORMAN, District Judge.

The complaint alleges the following facts: On June 1, 1926 plaintiff issued a policy of insurance on the life of Joseph DeRoulhac Moreno in the sum of $3,000 payable to Therese Marie Moreno, the wife of the insured. Pursuant to a request of the insured on October 23, 1935, plaintiff changed the beneficiary in order to make the proceeds of the policy payable to his estate. The beneficiary was again changed pursuant to another request of the insured, and at the time of his death the policy was payable to Marjorie E. Bathurst. It alleges its willingness to pay over the proceeds of the policy, but that conflicting claims thereto have been asserted. Marjorie E. Bathurst has demanded the money by virtue of her being the beneficiary designated in the policy. Therese Marie Moreno has also demanded of the plaintiff the insurance money on the ground that the change in beneficiary was of no legal effect due to the mental incompetency of the insured, and due to the coercion and undue influence exerted

upon the insured by Marjorie E. Bathurst. Plaintiff also alleges that Frederic Gilbert Bauer has asserted a claim against the proceeds of the policy as a general creditor. It is requested that these adverse claimants interplead and settle their claims among themselves.

Plaintiff has paid over the money into the Registry of this court, and an order that the defendants, Marjorie E. Bathurst, and Therese Marie Moreno, interplead has been entered.

The interplea of Therese Marie Moreno alleges the illegality of the change in beneficiary due to the incompetency of the insured and his submission to the coercion and undue influence of Marjorie E. Bathurst. In addition she alleges that the transfer was against public policy as tending to disrupt the normal marital relations between her and her husband, to estrange and alienate the affections of her husband, and to prevent a resumption of their normal married life.

Marjorie E. Bathurst demands the proceeds of the insurance policy and joins issue with the allegations contained in the plea of Therese Marie Moreno.

The following stipulation has been entered into by the parties:

"7. The case on behalf of Therese Marie Moreno will be presented to this court in the form of depositions and documents. It is agreed that the court may consider the case upon these proofs and the pleadings as if a formal motion for a dismissal were made by Marjorie E. Bathurst, contending that upon the facts so presented and the law the said Therese Marie Moreno has shown no right to relief. Said motion is based upon the procedure outlined in Federal Rule 41(b) [28 U.S.C.A. following section 723c]. If the court shall be of the opinion that said motion should be granted, it is agreed that a decree may be entered in favor of the said Marjorie E. Bathurst without prejudice to the claim of Frederic Gilbert Bauer, Trustee, as a creditor. If this court shall be of the opinion that this motion should be denied, then the said Marjorie E. Bathurst will be given an opportunity to present such proofs as she may desire either in open court or by way of deposition and the said Therese Marie Moreno may thereafter present such further proofs in rebuttal thereof by deposition or otherwise as she may desire. The determination of this cause shall then abide the court's consideration of these proofs."

An analysis of the documentary proofs presented herein disclose the following circumstances: The insured Joseph DeRoulhac Moreno was an eye, ear, nose and throat specialist with the rank of Major in the Medical Corps of the United States Army at the time of his death. On October 9, 1911, he was married to Therese Marie Moreno, and between 1928 and 1932 they resided together on the military reservation at West Point, New York. Around 1930 Major Moreno met Mrs. Marjorie E. Bathurst of Radburn, New Jersey, whose young son was a patient at the hospital in West Point. This meeting marks the inception of a friendship which precipitated divorces of Major Moreno and Mrs. Bathurst from their respective spouses, culminating in the marital engagement of Major Moreno and Mrs. Bathurst, their ultimate union being doomed by virtue of Major Moreno's decease. This meeting also marked the beginning of frequent visits to Mrs. Bathurst's household in Radburn.

In 1932 Major Moreno was transferred to Boston, Massachusetts, and at that time Mrs. Bathurst's and Major Moreno's affections for each other had deepened into love and affection. At this time, however, there was an interval in which they did not see each other. This pause was broken when Major Moreno left Boston in the fall of 1934 for a three months stay at the Medical Field Service School, Carlisle, Pennsylvania. On his way to Carlisle he communicated with Mrs. Bathurst to ascertain if their affections for each other had diminished. This meeting evidently is the climax of the courtship in which Major Moreno ascertained that life with Mrs. Moreno had become intolerable and unbearable due to his love for another woman.

He returned to his wife in Boston around the first of the year 1935, and at that time he disclosed his love for Mrs. Bathurst, and requested his freedom in order that he might be married to her. In February he left his wife. Between the following April and June he was confined in the hospital at Fort Banks, Winthrop, Massachusetts due to a heart condition. At the end of his hospitalization he spent a six weeks sick leave with Mrs. Bathurst in order to convalesce.

In the fall of 1935 Mrs. Moreno commenced a suit against Major Moreno for separate support in the State of Massachusetts which was settled by a trust agreement entered into on October 18, 1935 in which Major Moreno agreed to pay her a monthly stipend for the remainder of her life, and the proceeds of certain insurance policies in the event he predeceased her.

On the same day he made his will making Mrs. Bathurst his sole beneficiary and executrix of his estate. A few days later he directed the Acacia Life Insurance Company to change the beneficiary of the policy in suit from Mrs. Moreno to his estate. Subsequently, he directed that the beneficiary be changed from his estate to Mrs. Bathurst.

On December 28, 1939, Major Moreno commenced a suit for divorce, and on the following day he sailed for Manila, Philippine Islands, where he was connected with the Sternberg General Hospital. On August 5, 1936, the following summer, he was given a final divorce decree, leaving him free to marry Mrs. Bathurst who remained in the United States. This marriage was precluded by his death on October 16, 1936.

There is testimony indicating that Major Moreno was self-conscious about his conduct, which he admitted to be reprehensible. This compunction manifested itself following his return from Carlisle, Pennsylvania, and there is evidence of the development of a complete change in personality. He was indecisive in that he could not determine whether he should marry Mrs. Bathurst or reconcile himself with his wife. In this dilemma he resorted to drink, and even expressed a desire to commit suicide. He became irritable, nervous, surly, quick-tempered, forgetful, unstable in determination, irresponsible, careless in his dress, aged in appearance and neglectful of the interests of his patients.

Prior to Major Moreno's sojourn at Carlisle, Pennsylvania, there is evidence indicating that he and his wife were a happy couple (Mrs. Bathurst to the contrary), that he was natty in his dress, affable, pleasing in his disposition, and extremely interested in the welfare of his patients irrespective of their number.

With specific reference to Major Moreno's alleged susceptibility to influence there is testimony indicating that he was easily persuaded by women in that he usually sided with the nurses in their frequent arguments with the doctors at the hospital.

In this respect, however, Edward C. Greene, Lieutenant Colonel in the Medical Corps and psychiatrist, gave a more scientific justification for his opinion concerning the mental status of Major Moreno. He stated that the higher mental processes are the later ones to develop and the first to deteriorate, as we see in old age and childhood. Due to the sclerotic conditions of the blood stream in the brain of Major Moreno, the normal supply of blood to the cells of the brain was restricted, and this accelerated deterioration. With this deterioration, he opined that the individual is less able to form judgments, and is easily influenced. In answer to the question, "In your opinion, based on the facts you have named, was Major Moreno in the latter part of 1935, and the early part of 1936 able to exert the resistance of a normal individual to the influence of another person?", he replied, "I would not expect that he would be able to act in a perfectly normal manner". This conclusion was based upon Major Moreno's change in personality, his condition at the time of his confinement at Fort Banks hospital, the report on his autopsy, and his personal observation of Major Moreno around 1923.

Colonel Stuart C. Godfrey testified that he advised Major Moreno to consult with Dr. Peck, a psychiatrist. He apologetically explained, however, that one should not imply from this suggestion that Major Moreno was "suffering from some form of mental derangement which prevented his understanding the nature of the daily acts performed". On the contrary, Colonel Godfrey was of the opinion that Major Moreno knew and understood the acts that he performed.

Dr. Peck examined Major Moreno on January 8, 10, 31 and June 12, 1935, and in reply to the question, "What did you notice on those occasions as to his mental stability and susceptibility to influence?", he said, "I noticed he was in a distraught mental condition and I should say that was all".

Robert E. Thomas, Lieutenant Colonel, Medical Corps, United States Army, in reply to the question, "Would any of the physical or mental conditions to which you have testified as existing on the part of

Major Moreno affect in any way his ability to resist the influence exerted on him by another person?", stated, "I would say no. Major Moreno had not changed in his general make-up since I knew him in 1923".

Edward Weidner, Lieutenant Colonel, Medical Corps, United States Army, was associated with Major Moreno while he was stationed in Manila. In reply to the question, "Was Major Moreno cognizant of the nature of the acts that he performed or was he suffering from some form of mental derangement which prevented his understanding the nature of the daily acts he performed", he stated, "I think he was cognizant of both his acts and I think he knew and understood the acts that he performed".

In order to support the prayers for relief asserted by Marie Therese Moreno, we must conclude from the above recitation of facts that Major Moreno was either unduly influenced by Mrs. Bathurst, or the designation of Mrs. Bathurst as beneficiary under the policy of insurance involved herein is contrary to some rule of public policy.

The testimony offered does not support a charge of undue influence. We agree that Major Moreno's physical condition during the course of events leading up to his divorce from his wife was none too good. With reference to his mental condition he only evinced the perplexity and indecisiveness to be expected from one confronted with his problems. The question then is whether or not he was unduly influenced by Mrs. Bathurst. The testimony of those who observed Major Moreno does not indicate that he possessed the symptoms of one who would willingly submit to undue influence within its legal meaning. It only shows that he was not "normal" or that he was "distraught". It would be phenomenal for his condition to be otherwise.

There is a complete absence of testimony showing any dominating influence exerted by Mrs. Bathurst. So far as we know, she made only one inquiry about his insurance policies, and that inquiry was made subsequent to the change in beneficiary of the policy in suit, and actually reached him after his death. The only influence she possessed over him was the usual influence one would expect from a prospective bride. From that we cannot infer influence that extended to dominating proportions.

In behalf of Therese Marie Moreno there have been numerous cases cited which hold that a presumption of undue influence arises when there is a confidential relation between the donor and donee. Accordingly, she endeavors to persuade this court that the presumption is applicable here. We think, however, that in the application of this principle a distinction should be made between gifts inter vivos and testamentary transfers. With this distinction in mind the impertinency of these citations is established. The reason for this difference is that in the case of gifts inter vivos the donor presently divests himself irrevocably of possession of the subject of the gift, and, hence, to protect the donor there is a presumption of undue influence which the donee must disprove. In the case of testamentary transfers, and we think a change of beneficiary in an insurance policy is analogous, the disposition is ambulatory, that is, it is revocable until the death of the testator. In such case there is not so great a necessity for protecting the testator, because he does not presently divest himself of anything, and usually he has some time to collect his wits and overcome any domination exerted upon him. Hence, there is no presumption of undue influence in such case which must be disproved by the recipient of the transfer.

And the case of Brotherhood of Railroad Trainmen v. Van Etten, 90 N.J.Eq. 612, 110 A. 121, so holds. Therein, an insurance policy was originally payable to the wife of the insured. Thereafter, the insured became separated from his wife and made his sons beneficiaries. Still later the policy was made payable to his sister who cared for him in his last illness. Upon his death it stood in her name. During the time the insured lived with his sister he suffered from very severe heart trouble. The sons attacked the last transfer as having been obtained by fraud and undue influence. The court stated:

"This is not a case of a man who stripped himself by a deed of all his property. He retained, until the time of his death, six or seven weeks later, the right to change the beneficiary at any time.

"I find no evidence of fraud or undue influence.

"There is a presumption of undue influence where confidential relations exist, such as that of attorney and client, guardian and ward, etc., between parties to a

gift inter vivos, probably also in case of a gift causa mortis, but not in the case of a testamentary gift; and I view this matter in the light of a testamentary disposition rather than a gift inter vivos." 90 N.J. Eq. 612, 614, 110 A. 121, 122.

We, therefore, conclude, that Mrs. Moreno has not established her allegation of undue influence.

With reference to the charge that the change in beneficiary is contrary to some rule of public policy we likewise hold that the charge is unfounded. We agree with the principle that the validity of an agreement conditioned upon the dissolution of the marital relation is limited, but we are not convinced of its applicability herein in that the change in beneficiary under the insurance policy was not conditioned upon the dissolution of the marital relation of Major and Mrs. Moreno.

It follows that the claim of Mrs. Moreno is unfounded, and should be dismissed.